J-A26039-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| KIMBERLY P. CLYMER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DANIEL J. KIEFER | : | |
| | : | |
| Appellant | : | No. 1361 EDA 2022 |

Appeal from the Order Entered May 3, 2022
In the Court of Common Pleas of Northampton County Civil Division at
No(s):  DR-0007021,
PACSES: 242300687

BEFORE:  BOWES, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:            **FILED DECEMBER 19, 2022**

Daniel J. Kiefer (Kiefer) seeks review of a final order of the Court of Common Pleas of Northampton County (trial court) determining his support obligations for the care of his biological daughter, L.R.C. (the Child).  The child's biological mother, Kimberley P. Clymer (Mother), had filed the support action against Kiefer on the Child's behalf.  In this appeal, Kiefer argues that the trial court erred in failing to apply the paternity by estoppel doctrine; in calculating the parties' respective incomes; and in failing to apply the nurturing parent doctrine.  We affirm in part and reverse in part.

_____

[*] Retired Senior Judge assigned to the Superior Court.

**I.**

At the time the Child was conceived in 2016, Mother was romantically involved both with John Clymer and Kiefer. When Mother and John Clymer married later that year, John Clymer was unaware that the Child was possibly the biological offspring of someone else.

Despite her assurances to John Clymer, Mother was herself unclear on the Child's parentage, and she contacted Kiefer during her pregnancy to notify him that he was possibly the biological father. Nevertheless, Mother and John Clymer got married on April 20, 2016. John Clymer was led to believe that he had fathered the Child, who was born on November 2, 2016, and John Clymer was identified as the Child's father on the original birth certificate.

The Child resided with John Clymer and Mother, and she was held out as the couple's daughter. That changed about three years later, in December 2019, when John Clymer and Mother separated, and Mother, for the first time, made it known to John Clymer that she believed Kiefer was the biological father, effectively ending John Clymer's relationship with the Child.

Mother filed a child support complaint against John Clymer and an order of support was entered on February 18, 2020. However, the parties agreed that the order would be contingent on the results of a court-ordered paternity test. This testing established that John Clymer was not the Child's biological father, resulting in the trial court dismissing Mother's complaint for support. The trial court also vacated the support order and directed that John Clymer's

name would be removed from the Child's birth certificate. Further, John Clymer was ordered to have no further contact with the Child.

Mother then filed a support action against Kiefer on January 21, 2021. In response, Kiefer filed preliminary objections in which he argued in part that the support action must be dismissed because he was not the biological father of the Child and the facts established "paternity by estoppel" precluding John Clymer's renunciation of an assumed duty of parentage. Following the depositions of Mother and John Clymer, as well as argument on the issue of paternity by estoppel, Kiefer's preliminary objections were overruled.

On August 31, 2021, Kiefer appealed the order overruling his preliminary objections. We quashed the appeal on September 27, 2021, finding that it arose from an unappealable interlocutory order. On remand, the trial court held a support conference on November 17, 2021, at which Kiefer denied paternity. The next month, however, the results of the paternity testing established that Kiefer is indeed the Child's biological father.

The case was remanded to the trial court's Domestic Relations Section for the entry of an order of support, and such an order was entered on March 10, 2022. Mother's gross monthly income was calculated to be $1,476 per month, and her adjusted net income was calculated to be $1,404 per month. Her reported income was generated from part-time employment, and Mother testified that she had not worked full-time since the Child's birth because she was unable to afford day-care. The final calculation of Mother's income

included deductions of her union dues and federal tax credits. *See* Trial Court Order and Opinion, 5/3/2022, at 7.

Kiefer's gross monthly income was calculated to be $8,410 per month, and his adjusted net income was calculated to be $6,113 per month. These figures were derived from averaging Kiefer's earnings from the preceding six-month period and then deducting Kiefer's federal tax credits and union dues. *Id.*

The Uniform Support Guidelines were utilized by the Domestic Relations Section to determine that Kiefer's support obligation for the Child would total about $1,059 per month. *Id.* Kiefer again filed a notice of appeal, and it was once more quashed as interlocutory because a final order of support had not yet been entered by the trial court.

When proceedings resumed in the trial court, Kiefer disputed the calculations of the parties' respective incomes and earning capacities. He argued that his income calculation was inflated, and that Mother's earning capacity was too low due to an erroneous application of the "nurturing parent doctrine," which permitted Mother's earning capacity to be assessed at no more than her acknowledged earnings from part-time employment. A *de novo* hearing was held on April 18, 2022, where testimony was taken from the parties regarding their current earnings and earning capacities. On May 3, 2022, the trial court entered an opinion and order adopting the calculations of

the Domestic Relations Section. **See** Trial Court Opinion and Order, 5/3/2022, at 7-8. Kiefer timely appealed.[1]

## II.

Kiefer's first claim in this appeal is that the trial court abused its discretion in declining to bar Mother's support action under the doctrine of paternity by estoppel. According to Kiefer, he cannot be held liable for support of the Child because she had been treated as the daughter of Mother's former husband, John Clymer, from the time of the Child's birth in 2016 until the end of 2019. Kiefer also stresses that he has never met the Child, much less assumed the role of the parent in any capacity since the Child's birth.

The doctrine of paternity by estoppel allows a court to make a legal determination of paternity based solely on the conduct of a putative parent with respect to a child, regardless of genealogy. **See K.E.M. v. P.C.S.**, 38 A.3d 798, 800 (Pa. 2012); **see also Brinkley v. King**, 701 A.2d 176, 180 (Pa. 1997). That is, under the doctrine, "the person who has cared for the child is the parent." **K.E.M.**, 38 A. 3d at 800 (quoting **Brinkley**, 701 A.2d at 180). Once a court determines that parental estoppel applies, it may bar either a putative father from denying paternity or a mother from succeeding

---

[1] "In matters involving child support, we as an appellate court will not disturb a trial court order absent an abuse of discretion." **Vargo v. Schwartz**, 940 A.2d 459, 462 (Pa. Super. 2007).

in a support action against a third party who is the biological father.  *See Vargo v. Schwartz*, 940 A.2d 459, 464 (Pa. Super. 2007).

"The doctrine is designed to protect the best interests of minor children by allowing them to 'be secure in knowing who their parents are.'"  *Moyer v. Gresh*, 904 A.2d 958, 962 (Pa. Super. 2006) (quoting *Bahl v. Lambert Farms, Inc.*, 819 A.2d 534, 539 (Pa. 2003)).  Where a person "has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father."  *Brinkley*, 701 A.2d at 180.

In the present case, the record supports the trial court's conclusion that paternity by estoppel does not apply.  Mother's prior support action against her ex-husband, John Clymer, has already resulted in a final determination that he is not obligated to financially support the Child.  The trial court also ordered John Clymer to have no further contact with the Child.  Because there is no longer a parental relationship to protect, and estopping the support action would be detrimental to the Child (on whose behalf the action was filed), the trial court did not abuse its discretion in declining to apply the doctrine.

## III.

Kiefer's second claim is that the trial court miscalculated his income when determining his monthly support obligations for the Child.  The trial court

found that Kiefer has an average monthly gross income of $8,410, and an average adjusted net income of $6,113 per month based on his average pay for the six months preceding the most recent assessment of his earnings in the 2021 tax year. Kiefer now argues that his W-2 for the 2021 tax year shows a gross annual income of $89,618, with average gross earnings of $7,468 per month during that 12-month period; he also argues as a sub-issue that the trial court deducted 5% in union dues from his average gross income to determine his average net income, when, in fact, his union dues were 6.8% of his gross earnings.

Under Pa.R.C.P. 1910.16-2(a), monthly gross income "is ordinarily based on at least a six-month average of a party's income." The guideline set forth in the rule does not require consideration of income beyond the preceding six months. *See* Pa.R.C.P. 1910.16-2(a). Although Kiefer's average earnings were evidently less in the first half of the 2021 tax year than in the second half, we fail to see how the trial court abused its discretion in relying upon the more recent six-month period, as this was the ordinary method of calculation as set forth in the governing rule. *See id.*

With respect to the labor dues deduction, we find merit in Kiefer's claim. The trial court adopted the calculations of the Domestic Relations Section, and the trial court seemed to presume that the calculation of Kiefer's net income resulted from a union dues deduction of 6.8%. *See* Trial Court Order and

Opinion, 5/3/2022, at 7. However, the record does not support the trial court's assumption.

The Domestic Relations Section recognized two sums of monthly union dues – one for $420.52 (which is exactly 5% of Kiefer's monthly gross income of $8,410), and one for $41 (which is about .5% of Kiefer's monthly gross income of $8,410). This totals only a 5.5% deduction, which falls short of the 6.8% figure which the trial court erroneously believed was used to calculate Kiefer's monthly support obligations under the Uniform Support Guidelines. As both the trial court and the parties agreed that a 6.8% deduction was warranted (which should have resulted in a deduction of $571.88), the case must be remanded so that the trial court can recalculate Kiefer's support obligations with the full labor dues deduction taken into account.

**IV.**

Kiefer's final two claims concern the trial court's calculation of Mother's earnings when determining the parties' monthly support obligations. He argues that Mother's monthly gross income was calculated to be $1,476 despite that, based on her W-2 for the 2021 tax year, her average pay was about $1,576. Further, Kiefer contends that the trial court erred in applying the nurturing parent doctrine, which resulted in a lower calculation of Mother's earning capacity and a higher support obligation for Kiefer.

As discussed above, monthly gross income "is ordinarily based on at least a six-month average of a party's income." Pa.R.C.P. 1910.16-2(a). The

trial court's determination of Mother's income was based on her earnings during the six-month period which preceded the calculation. This was the ordinary method of calculation as set forth in the governing rule, **see id.**, and the trial court did not abuse its discretion in relying solely on Mother's earnings during that span.

As to the trial court's application of the nurturing parent doctrine, we find no abuse of discretion. The doctrine is as follows:

> [E]arning capacity cannot always be imputed to a parent who chooses to stay home with a minor child. In appropriate cases, such a nurturing parent may be excused from contributing support payments. A trial court, so holding, must consider the age and maturity of the child, the availability of others who might assist the parent, the adequacy of available financial resources if the parent remains at home, and finally, the parent's desire to stay home and nurture the minor child.

**Hesidenz v. Carbin**, 512 A.2d 707, 710 (Pa. Super. 1986) (discussing **Wasiolek v. Wasiolek**, 380 A.2d 400 (Pa. Super. 1977)).

Mother testified in this case that she is unable to work a full-time job because she cannot afford the cost of day-care for the Child, requiring Mother to stay home during the day to provide care. As of the date when Mother sought support from Kiefer, the Child was not yet of school-going age. For those reasons, we conclude that the trial court did not abuse its discretion in determining that Mother is a nurturing parent whose earning capacity need not be based on a potential salary from full-time employment.

Order affirmed in part, reversed in part. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/19/2022</u>